IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 20 CR 30117-SMY |
| | ) |
| KATHLEEN M. DVORAK, | ) |
| | ) |
| Defendant. | ) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorneys, Steven D. Weinhoeft, United States Attorney for the Southern District of Illinois, and Scott A. Verseman, Assistant United States Attorney for said district, submits for the Court's consideration this Sentencing Memorandum.

I.      **RECOMMENDATION**

The parties agree that the defendant's Sentencing Guidelines range is 41 – 51 months of imprisonment.[1] Under the facts of this case, justice requires a sentence of imprisonment at the high end of that range. The United States respectfully recommends that the Court impose a sentence of 51 months of imprisonment.

---

[1] In the Pre-Sentence Investigation Report, the Probation Officer has calculated Defendant's adjusted offense level to be 23, and her criminal history category to be I, resulting in an imprisonment range of 46 to 57 months. PSR at ¶ 79. The Probation Officer arrive at an offense level that is one level higher than that calculated by the parties. The difference is based upon the Probation Officer's determination that the Government would not be moving for the third level of reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(b). PSR at ¶ 34. There appears to have been a miscommunication between the undersigned Assistant United States Attorney ("AUSA") and the Probation Officer on this point.

The Defendant chose not to enter into a Plea Agreement in this case. As a result, the parties had not set forth in writing their positions regarding the Sentencing Guidelines. When the Probation Officer called the undersigned AUSA and inquired of the Government's position on acceptance of responsibility, the undersigned indicated that the Government had not yet decided whether it would agree that a § 3E1.1 reduction was appropriate. In the written Stipulation of Facts, the Defendant expressly reserved her right to challenge the Government's loss calculation. R. 21 at ¶ 7. Further, when she was interviewed by the FBI, Defendant estimated that the loss was only $150,000 to $180,000. PSR at ¶ 23. Thus, at the time of the undersigned AUSA's conversation with the Probation Officer, he was unsure what position the Defendant would take at sentencing regarding the loss calculation.

Application Note 1(A) of Guideline 3E1.1 states that, in determining whether a Defendant qualifies for a § 3E1.1 reduction, a court should consider whether the defendant has truthfully admitted, falsely denied, or frivolously contested relevant conduct. Based upon this provision, the undersigned AUSA wished to learn Defendant's position regarding the loss calculation prior to determining the Government's position on acceptance of responsibility.

In the Defendant's "Response to the United States' Objections to the Pre-Sentence Report," defense counsel indicates that the Defendant accepts the Government's loss calculation, with the exception that she believes the loss figure should be reduced by amounts that she should have been paid for bookkeeping services rendered to the victim. R. 27,  While the United States disagrees with the defense on this point, this argument does not constitute a false or frivolous denial of relevant conduct. This is merely a disputed legal point which the Court will have to decide. Because Defendant is not falsely denying or frivolously contesting relevant conduct, the United States agrees that Defendant should receive the full three level reduction for acceptance of responsibility under § 3E1.1.

## II.    18 U.S.C. § 3553 SENTENCING FACTORS

A.    *Seriousness of the Offense*

"The court, in determining the particular sentence to be imposed, shall consider . . . (2) the need for the sentence imposed – (A) to reflect the seriousness of the offense . . . ."  In the present case, defendant Dvorak's criminal conduct was very serious and therefore requires a sentence of a significant amount of imprisonment.

The victim in this case, T.B., is a 74-year old physician.  PSR at ¶ 17;[2] VIS at p. 1.[3]  In order to focus on his medical practice, T.B. hired Defendant Dvorak to work as his personal bookkeeper.  *Id.*  Specifically, T.B. entrusted Dvorak to deposit his income checks into his bank accounts, write checks to pay his expenses, and record his revenues and expenses in an electronic accounting software program.  PSR at ¶ 17.  As T.B. has stated to the Court, he "trusted her completely."  VIS at p. 1.

Shortly after she began working as T.B.'s bookkeeper, Dvorak began stealing from him and defrauding him.  Dvorak took T.B.'s money in three different ways.  First, she wrote large checks, payable to herself, on both T.B.'s PNC and Commerce Bank accounts.  PSR at ¶¶ 19, 26.  Between December 31, 2012, and July 8, 2019, Dvorak wrote a total of $909,700.38 in checks payable to herself from T.B.'s accounts.  *Id.*

In addition, when she deposited T.B.'s income checks into his accounts, Dvorak did not deposit the full amounts of those checks.  PSR at ¶ 27.  Instead, she caused the banks to disburse

---

[2]    The Pre-Sentence Investigation Report is contained in the record at document number 23.  All citations to this document are denoted "PSR" and followed by the applicable paragraph number.

[3]    T.B. submitted a Victim Impact Statement, through his attorney, directly to the Court via email on July 13, 2021.  Defense counsel was copied on the email.  All citations to T.B.'s Victim Impact Statement are denoted "VIS" and followed by the applicable page number.  The cover letter of T.B.'s attorney is not included for purposes of counting pages.  The Victim Impact Statement of T.B.'s life partner, A.K., is attached to T.B.'s Victim Impact Statement and begins at page 4.

substantial amounts of cash from these checks directly to her. *Id.* Between December 27, 2013, and May 29, 2019, Dvorak took cash totaling $485,002.35 from T.B.'s checks. *Id.*

The third way that Dvorak took money from T.B. was through electronic, online funds transfers from T.B.'s Commerce Bank account to her accounts. PSR at ¶ 28. From June 4, 2016, through January 3, 2019, Dvorak transferred $100,370.01 from T.B.'s account to her own. *Id.*

Dvorak concealed her thefts from T.B. by making false and fraudulent entries in T.B.'s accounting records. PSR at ¶¶ 20, 24. For the checks she wrote to herself, Dvorak frequently "made up" vendor payments, falsely stating that the monies went to pay for fictitious expenses. PSR at ¶ 24. Other times, she simply left the payee information blank in the accounting program. *Id.*

Dvorak's crimes have had a devastating impact on the victim. In this case, the victim is not a bank or some large, national corporation that can easily absorb a loss of close to $1.5 million. The victim is a 74 year old physician. Because of Dvorak's crimes, T.B. now finds himself in a position where he must work many hours to provide for himself and his partner. VIS at p. 1. To do this, T.B. has to frequently travel from his home in Florida to the hospitals he contracts with. *Id.*

Instead of enjoying his retirement, T.B. has been forced to continue working in order to earn money to pay his expenses and rebuild his assets for retirement. VIS at p. 1. T.B.'s health has declined due to the long and stressful hours he is required to put in. *Id.* This is difficult at the age of 74. *Id.* In addition to the long hours, T.B. is also required to travel lengthy distances to perform this work. *Id.* Further adding to the detrimental effects of this situation is that T.B. has had to continue working, and travelling, during the COVID-19 pandemic. *Id.* T.B. did, in fact, contract COVID, but fortunately it was not a debilitating case. *Id.*

Beyond the extreme financial hardship, Dvorak's crimes have taken a devastating emotional toll on T.B. VIS at p. 1. He indicates that he is "embarrassed and humiliated." *Id.* T.B. was forced to borrow a substantial sum of money from his partner, A.K. *Id.* Further, because of T.B.'s need to continue working long hours, T.B. and A.K. are forced to spend many days apart, and have been unable to visit their families on holidays. VIS at 6. This situation has placed great stress on their relationship and they both have difficulty sleeping. *Id.*

And, on top of everything else, T.B. ended up owing $200,000 to the IRS in back taxes. *Id.* at p. 2. Instead of paying the IRS like she was supposed to, Dvorak stole that money, and made false accounting entries showing that the IRS payments had been made. *Id.*

Dvorak's offenses are incredibly serious. Those crimes caused tremendous financial and emotional harm to both T.B. and A.K. The seriousness of Dvorak's crimes warrant a sentence at the upper end of the Guidelines range.

B.   *History and Characteristics of the Defendant*

Dvorak has no prior convictions and her criminal history category is I. PSR at ¶ 49. This factor weighs in her favor.

It is interesting to note, however, that Dvorak has none of the factors in her background which typically are used to explain a defendant's fraudulent conduct. She has no history of drug or alcohol abuse. PSR at ¶ 64. Likewise, she has no mental health issues. PSR at ¶ 63. Dvorak had a good childhood and was raised by two loving parents. PSR at ¶ 57. And she has consistently maintained steady employment with good jobs. PSR at ¶¶ 68 – 72. Prior to working as T.B.'s bookkeeper, Dvorak owned and operated her own insurance agency. PSR at ¶ 72. She also worked for ten years as a physician services representative at Belleville Memorial Hospital. PSR at ¶ 71.

Dvorak's solid employment background and lack of substance abuse issues begs the question – Why? Why did she engage in scheme to defraud T.B. for over 6 ½ years? Why did she take almost $1.5 million from him?

When she was interviewed, Dvorak told the FBI case agent that she began stealing money from T.B. in 2013 or 2015 when she divorced her husband and lost his income. PSR at 23. But this doesn't square with what she told the Probation Officer, which was that her marriage was dissolved in 2018. PSR at ¶ 59.

Even absent the issue with the dates, the loss of her husband's income does not fully explain Dvorak's fraud. Between October 4, 2012, through June 29, 2019, Dvorak defrauded T.B. out of $1,495,072.74. R. 24. That's an average of approximately $230,000 per year. Surely, Defendant's normal living expenses (mortgage, utilities, groceries, etc.) were not $230,000 per year. Why did she need to take so much from T.B. and inflict such great harm upon him?

In the absence of any other reason, the only rational explanation the Government can see for Defendant's crimes is GREED. Pure, unadulterated, greed. By inflicting such tremendous harm upon T.B. for the purpose of satisfying her own greed, Dvorak has displayed a level of callousness and cold-heartedness that should be considered by this Court in determining the appropriate sentence.

    C.    *General Deterrence*

Subsection (a)(2)(B) of Section 3553 instructs district courts to consider the need for the sentence "to afford adequate deterrence to criminal conduct. . . ." This section has commonly been referred to as the "general deterrence" provision.

The Seventh Circuit has repeatedly upheld prison sentence imposed in white collar cases where the sentence is based, at least in part, upon the need for general deterrence. In *United States*

*v. Schultz,* 743 Fed.Appx. 5, 9 (7th Cir. 2018), the defendant argued that the district court erred by not relying on the academic articles she presented which questioned the need for general deterrence. The *Schultz* court found: "[T]his position runs headlong into Congress's express enumeration in 18 U.S.C. § 3553(a)(2)(B) of deterrence (general and specific) as a proper sentencing factor. The district court's consideration of general deterrence was therefore entirely appropriate." *Id.*

The Seventh Circuit rejected a similar argument in *United States v. Brown,* 880 F.3d 399, 405 (7th Cir. 2018). In *Brown,* the court explained:

> We previously have endorsed the idea that white-collar criminals "act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity." *United States v. Warner,* 792 F.3d 847, 860 – 61 (7th Cir. 2015). They are, therefore, "prime candidates for general deterrence." *Id.* at 860 (*quoting United States v. Peppel,* 707 F.3d 627, 637 (6th Cir. 2013)). Our approach comports with that of our sister circuits. *See United States v. Musgrave,* 791 F.3d 602, 609 (6th Cir. 2014)("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (*quoting Peppel,* 707 F.3d at 637)); *United States v. Martin,* 455 F.3d 1227, 1240 (11th Cir. 2006)(using language identical to that in *Musgrave*); *cf. United States v. Goffer,* 721 F.3d 113, 132 (2d Cir. 2013)(noting that "high sentences" were necessary to alter the calculus "that insider trading 'was a game worth playing'").

880 F.3d at 405. Based upon this analysis, the *Brown* court held: "The district court, therefore, did not err in relying on such a widely accepted principle [general deterrence]." *Id.*

Recently, in *United States v. Patel,* 746 Fed.Appx. 569, 573 (7th Cir. 2018), the Seventh Circuit rejected a defendant's argument that the district court had erroneously failed to address his argument about the "ineffectiveness of general deterrence for white collar criminals." The Seventh Circuit held that the district court was under no obligation to give credence to Patel's arguments and articles questioning general deterrence in fraud cases. *Id.* at 574. "These amount to an

7

invitation to the court to disregard not only the Sentencing Guidelines, but section 3553(a) itself, which expressly recognizes deterrence as a factor to be considered. See 18 U.S.C. § 3553(a)(2)(B). A court does not have to justify a decision to stick with the law as it presently stands." *Id.*

Individuals who engage in fraud, embezzlement, and other types of white collar offenses tend to be more educated. They are the types of individuals who read newspapers and watch news programs. As a result, these "would be criminals" are routinely made of aware of fraudsters who go to prison for their crimes. Obviously, prison sentences in fraud cases will not deter all white collar criminals. But they will deter those individuals who think about the consequences of their actions, and weigh the costs vs. the benefits of their conduct.

D.      *Just Punishment*

"The court, in determining the particular sentence to be imposed, shall consider – (2) the need for the sentence imposed – (A) . . . to provide just punishment for the offense." 18 U.S.C. § 3553(a). It is the Government's position that the need for just punishment is the most important of the § 3553(a) factors to be considered by the Court in the present case.

We have all heard the adage "the punishment should fit the crime." This adage "is based on the theory that when an offender breaks the law, justice requires that they suffer in return, and that the response to a crime should be proportional to the offense." https://www.timesnews.net/opinion/editorials/editorial-hulsey-is-right-punishment-should-fit-the-crime/article_e8a4f356-a36f-11eb-a8c6-9759b2aed8ae.html#:~:text=Most%20have%20heard%20the%20adage,be%20proportional%20to%20the%20offense. When a victim suffers serious harm at the hands of a criminal defendant, both the victim and society at large expect the courts to balance the scales and impose a sentence that is commensurate with the harm caused by the defendant.

In the present case, defendant Dvorak has caused devastating harm to T.B. and his partner A.K. Their lives have been forever altered by Dvorak. She has caused them to sustain a financial loss of $1,495,072.74. A loss of $1,495,072.74 may not be much for a large national corporation, such as JP Morgan Chase or Walmart. But it is a tremendous amount of money for an elderly individual to absorb.

Beyond the enormous financial impact, Dvorak's crimes have caused significant additional harm to T.B. and A.K. They have lost their retirement security during the advanced stages of their lives. T.B. has been forced to work long hours, and travel great distances, at the age of 74. His health has suffered. And both T.B. and A.K. have been emotionally traumatized by Dvorak.

In compliance with 18 U.S.C. § 3771(a)(5), the undersigned Assistant United States Attorney ("AUSA") has spoken with the T.B. and his attorney about the upcoming sentencing hearing in this case. During these conversations, T.B. expressed his view that a sentence of probation in this case would be unjust, given the magnitude of the harm Dvorak has caused to him and A.K. During his allocution, it is expected that T.B. will ask this Court to impose a significant prison sentence. The United States respectfully asks the Court to consider that the victims have a need for justice, and a need to see that the justice system has punished the individual who caused them such grievous injury.

    E.    *Restitution*

In this case, "the need to provide restitution to any victims" factor of § 3553(a)(7) does not weigh against a prison sentence. Regardless of whether the Court accepts the Government's or Defendant's position on the issue, Dvorak will owe an astronomical amount of restitution. To date, she has paid nothing toward the amount she owes. VIS at p. 2. Further, the Probation Officer reports: "The defendant does not appear to have the financial resources to make an immediate

9

monetary payment." PSR at ¶ 76. Dvorak should not be allowed to escape the prison sentence her crimes warrant by promising to make nominal restitution payments from her future paychecks. These minimal payments will not make T.B. whole, nor will they satisfy the need for justice in this case.

### III. CONCLUSION

For the foregoing reasons, the United States respectfully recommends that this Court sentence defendant to a period of 51 months of imprisonment, which is at the high end of the applicable Sentencing Guidelines range.

Respectfully submitted,

STEVEN D. WEINHOEFT
United States Attorney


s/ *Scott A. Verseman*
SCOTT VERSEMAN
Assistant United States Attorney
Nine Executive Drive
Fairview Heights, IL  62208
scott.verseman@usdoj.gov
(618) 628-3700
Fax:  (618) 628-3720

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Case No. 20 CR 30117-SMY ) |
| KATHLEEN M. DVORAK, | ) ) |
| Defendant. | ) |

**Certificate of Service**

I hereby certify that on October 15, 2021, I caused to be electronically filed the foregoing "Government's Sentencing Memorandum" to be filed with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to all attorneys of record.

Respectfully submitted,

STEVEN D. WEINHOEFT
United States Attorney

s/ *Scott A. Verseman*

SCOTT VERSEMAN
Assistant United States Attorneys
Nine Executive Drive
Fairview Heights, IL  62208
scott.verseman@usdoj.gov
(618) 628-3700
Fax:  (618) 628-3720